COURT OF APPEALS OF VIRGINIA

Present:  Judges Benton, Bumgardner and Frank
Argued at Richmond, Virginia


JASON WAYNE GREGORY

MEMORANDUM OPINION[*] BY
v.    Record No. 1671-99-2     JUDGE ROBERT P. FRANK
                                MARCH 13, 2001
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Herbert C. Gill, Jr., Judge

Steven D. Benjamin (Betty Layne DesPortes;
Benjamin & DesPortes, P.C., on briefs), for
appellant.

Leah A. Darron, Assistant Attorney General
(Mark L. Earley, Attorney General, on brief),
for appellee.


Jason Wayne Gregory appeals his convictions, after bench

trials, for capital murder, robbery, two counts of use of a

firearm, burglary, grand larceny, and vandalism.  On appeal, he

contends the trial court erred in:  1) denying his motion to

dismiss the burglary, grand larceny, and vandalism charges because

of a speedy trial violation pursuant to Code § 19.2-243, 2)

finding he was not in custody for the purposes of Miranda when he

was interviewed by police on January 4, 1998, 3) finding he did

not invoke his right to counsel during the January 4, 1998

interview, 4) denying his motion to suppress his statement and all

        * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

evidence derived from interviews on January 4, 1998 and January 16, 1998, 5) finding he made a knowing, intelligent, voluntary waiver of his Miranda rights prior to the January 16, 1998 interview, 6) denying his motion for a mistrial based on the Commonwealth's failure to comply with Rule 3A:11, and 7) denying his motion to strike the admission of his statements as a sanction for the Commonwealth's failure to comply with Rule 3A:11.

## I.  BACKGROUND

On December 31, 1997, a Chesterfield County police officer found James Michael Lambrecht (victim) lying dead in a parked vehicle.  An autopsy revealed the victim died as a result of two gunshot wounds to the right side of his head.  The victim's wife testified the victim sold marijuana, usually to his friends.  When the police began their investigation into the victim's death, she provided them with the victim's address book, which contained the names of people with whom the victim made drug transactions.  One of the names listed in the address book was "Jason," and the police determined from the victim's family that "Jason" was appellant.

Detective Elizabeth Baker visited appellant's home and left a message for him to contact her.  On January 4, 1998, appellant contacted Detective Baker, who, along with Detective Steve Smith, traveled to appellant's residence.  Appellant agreed to accompany the detectives back to the police station for an interview.  At this time, appellant was not placed under arrest, was not

-

handcuffed, and rode in the front passenger seat of the detectives' vehicle. Appellant was not advised of his Miranda rights prior to the interview. During the interview, appellant stated he had been with Jeff Able on the evening of December 30, 1997. At one point during the interview, appellant mentioned an attorney. He testified he said, "'I think I need an attorney,'" or "'I think I need a lawyer,' or something like that." Detective Smith responded, "Have you done something wrong that you need an attorney?" Detective Smith testified appellant's mention of a lawyer was phrased as a question such as, "Is it time for a lawyer," or "Think it's time for an attorney?" Detective Smith further testified he did not stop the interview because he considered appellant's words to be a question and not a request for an attorney. Appellant admitted he interpreted Detective Smith's response to mean that he did not need an attorney if he had done nothing wrong and admitted he did not mention an attorney at any other time during the interview. Appellant was not placed under arrest for the homicide of the victim at the conclusion of the interview. However, appellant was informed during the interview that there was an outstanding capias for his arrest, which was unrelated to the murder investigation. After the interview, an officer took appellant to the magistrate's office where he was served with the capias. Appellant was released on bond.

-

On January 9, 1998, Detective Baker interviewed Jeff Able, whose name also appeared in the victim's address book. Able told Detective Baker he had been at appellant's house the night of December 30, 1997. Able said appellant was drinking, firing his gun, and repeatedly asking Able if he wanted to kill someone that night. As a result of Able's statement, Detective Smith went to appellant's residence to conduct a search of the backyard. The police recovered three casings and two bullets in the yard. The search was conducted with the consent of Marvin Downs, another man who lived in the house.

On January 15, 1998, the Redeemer Lutheran Church on Redbridge Road in Chesterfield County was burglarized and $60,000 worth of church property was stolen or vandalized. During the investigation of this incident, an employee of a convenience store located near the church told the police that a man tried to buy batteries for a radio that matched the description of a radio stolen from the church. The police viewed the store's security camera videotape and identified the man with the radio as appellant.

On January 16, 1998, Able came to Detective Baker's office and told her he had been with appellant the day before and appellant indicated he had broken into the church. He further said appellant told him appellant had shot the victim and appellant's friend, Michael Sammons, had "finished off" the victim. The police arrested Sammons, and Sammons implicated

-

himself and appellant in the murder.  Sammons also told the police where to find appellant.  Police located appellant and took him into custody.  At police headquarters, appellant was advised of his Miranda rights and did not request an attorney.  Appellant admitted to the homicide of the victim during the videotaped interview.

During a hearing on October 19, 1998, appellant appeared with Mr. Tondrowski, co-counsel on the murder charge.  Appellant's other attorney, Mr. Morgan, who was the lead attorney in the murder case and his only counsel on the charges resulting from the church burglary, was not present.  The Commonwealth moved to continue the trial of the burglary-related charges until February 5, 1999.  The following exchange occurred between the trial court and Mr. Tondrowski:

> MR. TONDROWSKI:  Judge, the only problem
> I have with that is that I have not discussed
> this issue with Mr. Morgan, and Mr. Morgan
> represents him on the B&E's, and I do not.
> That's the problem I have with it.
>
> THE COURT:  All right.  Well, we're
> going to set it for February the 5th.  That
> is the burglary case.

The Commonwealth then moved to set the murder case during the period February 15 through February 22.  The trial court asked Mr. Tondrowski if he had the opportunity to consult with appellant regarding the waiver of speedy trial.  Mr. Tondrowski consulted with appellant and then indicated appellant was prepared to go forward with the waiver.  The trial court then queried appellant

-

regarding his waiver of speedy trial, and appellant stated he would waive his right to a speedy trial. The trial court set the murder trial for February 22, 1999.

On February 4, 1999, appellant filed a motion to dismiss the charges related to the church burglary because his right to a speedy trial had been violated. The trial court denied the motion. Appellant was subsequently tried and convicted of the charges related to the church burglary.

During the murder trial, the Commonwealth played an edited version of the videotaped statement appellant made on January 16, 1998. A copy of the videotape had been given to the defense before trial, but the copy did not work properly. As the videotape played, defense counsel realized he had not seen the portion of the tape being shown. The defense argued appellant had been prejudiced in preparing his defense because the defense had not viewed appellant's entire statement and moved for a mistrial. The trial court denied the motion for a mistrial, struck the portion of the tape the defense had not seen, and made Tori DeMaio, a witness who the defense argued may have been present at the scene of the murder, available to testify. Appellant also moved to strike the admission of the videotaped statement as a sanction. The trial court denied the motion to strike, and appellant was convicted of capital murder, robbery, and two counts of use of a firearm.

-

II.

Appellant argues the trial court erred in denying his motion to dismiss his burglary, grand larceny, and vandalism charges because the Commonwealth failed to try him within five months of finding of probable cause in violation of Code § 19.2-243.

Code § 19.2-243 states, in part:

> Where a general district court has found that there is probable cause to believe that the accused has committed a felony, the accused, if he is held continuously in custody thereafter, shall be forever discharged from prosecution for such offense if no trial is commenced in the circuit court within five months from the date such probable cause was found by the district court; and if the accused is not held in custody but has been recognized for his appearance in the circuit court to answer for such offense, he shall be forever discharged from prosecution therefor if no trial is commenced in the circuit court within nine months from the date such probable cause was found.

Code § 19.2-243(4), however, states the provisions of the section do not apply if the failure to try the accused was caused:

> By continuance granted on the motion of the accused or his counsel, or by concurrence of the accused or his counsel in such a motion by the attorney for the Commonwealth, or by the failure of the accused or his counsel to make a timely objection to such a motion by the attorney for the Commonwealth, or by reason of his escaping from jail or failing to appear according to his recognizance.

In Robinson v. Commonwealth, 28 Va. App. 148, 502 S.E.2d 704 (1998), we held:

-

Under Code § 19.2-243, the Commonwealth must commence trial within five months, which "translates to 152 and a fraction days." Ballance v. Commonwealth, 21 Va. App. 1, 6, 461 S.E.2d 401, 403 (1995). The five-month period begins to run on the day after the preliminary hearing at which probable cause is found. Randolph v. Commonwealth, 22 Va. App. 334, 335, 470 S.E.2d 132, 133 (1996). Any delays that are chargeable to the defendant are subtracted from the total number of days that elapse from the day after the finding of probable cause to the commencement of trial. If the time thus calculated exceeds 152 and a fraction days, the defendant "shall be forever discharged from prosecution for such offenses." Code § 19.2-243.

Id. at 152, 502 S.E.2d at 706.

"A defendant may agree to a general waiver of his or her statutory speedy trial rights, in which instance the accused foregoes his or her rights granted by Code § 19.2-243." Mitchell v. Commonwealth, 30 Va. App. 520, 528, 518 S.E.2d 330, 334 (1999). However, "a waiver of any constitutional right must be knowingly, intelligently, and voluntarily made." Peterson v. Commonwealth, 5 Va. App. 389, 396, 363 S.E.2d 440, 444 (1987) (citing Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).

In this case, on June 8, 1998, the general district court found probable cause to believe appellant committed the burglary, grand larceny, and vandalism. Therefore, under Code § 19.2-243, the Commonwealth had until November 7, 1998 to try appellant for these charges. Appellant was not tried until February 5, 1999.

-

At the October 19, 1998 hearing, the Commonwealth moved to continue the trial of the charges related to the church burglary until February 5, 1999. The attorney who represented appellant on the burglary-related charges was not present at the hearing. Co-counsel on the murder charge was present at the hearing and told the trial court that appellant's counsel for the burglary-related charges was not present. The trial court set the trial for the burglary charge for February 5, 1999, without asking appellant if he waived his right to a speedy trial. Then, the trial court proceeded to address the trial for the murder charge. With regard to the continuance of the murder trial, the court queried appellant about his desire to waive his right to a speedy trial and asked appellant if he had discussed the matter with his attorney. Appellant indicated his desire to waive his right to a speedy trial and agreed to set the murder trial for February 22, 1999. His attorney on the murder charge, who was present, concurred.

The discussions of the continuance of the trial of the burglary-related charges and the murder trial were two distinct conversations. Appellant was not represented by counsel on the burglary, grand larceny, and vandalism charges, and he was not asked whether he wished to waive his right to a speedy trial on those charges. The trial court set the trial for those charges without querying appellant. Once the trial judge set the trial for the burglary-related charges for February 5, 1999, the sole

-

issue in the court's colloquy was the continuance of the murder trial. We find appellant did not make a knowing, intelligent, and voluntary waiver of his right to a speedy trial with respect to the burglary, grand larceny, and vandalism charges, and, therefore, appellant's right to a speedy trial pursuant to Code § 19.2-243 was violated.

### III.

Appellant argues he was in custody during the January 4, 1998 interview and, because he was not advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), any statements and evidence derived from the interview should have been suppressed. The only evidence obtained during the interview that may have been incriminating or may have led to incriminating information was appellant's statement that he spent the evening of December 30, 1997 with Jeff Able.

Assuming, without deciding, appellant was in custody for the purposes of Miranda, we hold the police would have inevitably discovered Jeffrey Able's name.

> In Nix v. Williams, 467 U.S. 431, 447, 104 S. Ct. 2501, 81 L.Ed.2d 377 (1984), the Supreme Court of the United States held that "if the government can prove that the evidence [obtained by illegal means] would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury."

-

Timbers v. Commonwealth, 28 Va. App. 187, 199, 503 S.E.2d 233, 239 (1998).

> [T]he inevitable discovery exception requires that the prosecution show: "(1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct; (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct, and (3) that the police also prior to the misconduct were actively pursuing the alternative line of investigation."

Id. (quoting Walls v. Commonwealth, 2 Va. App. 639, 656, 347 S.E.2d 175, 185 (1986) (citation omitted)).

Federal courts have applied the inevitable discovery doctrine in cases where the evidence was obtained as a result of a Miranda violation. See Siripongs v. Calderon, 35 F.3d 1308, 1321 (9th Cir. 1994), cert. denied, 513 U.S. 1183 (1995); United States v. Martinez-Gallegos, 807 F.2d 868, 870 (9th Cir. 1987).

In this case, Detective Baker testified that the victim's wife gave the police an address book in which the victim kept the names of his contacts and a record of his transactions. Detective Baker testified the police were doing interviews "with any and everybody that knew [the victim]," and appellant's name in the book led to their initial interview with him on January 4, 1998. Able's name also was listed in the victim's book.

In this case, the police possessed the victim's book, which included both appellant's name and Able's name. The police testified they were interviewing everyone who knew the victim,

-

including the people listed in the book.  We hold, therefore, that there was a reasonable probability the police would have discovered Able's name exclusive of their interview with appellant on January 4, 1998.  The police possessed the book on January 4, 1998, when they conducted the interview with appellant.  Both Detectives Baker and Smith testified they were interviewing everyone who knew the victim.  Therefore, the police clearly possessed the lead, the book, making the discovery inevitable and were pursuing the alternative line of investigation, questioning everyone who knew the victim, prior to the January 4, 1998 interview.

## IV.

Appellant contends he invoked his right to counsel during the January 4, 1998 interview, which prohibited the police from initiating the second interview with him on January 16, 1998.

Assuming, without deciding, appellant invoked his right to counsel on January 4, 1998, he did not provide the police with inculpatory information subsequent to the invocation.  After the invocation, Detective Smith asked appellant if he had done something wrong and appellant answered that he had not.  The detective then tried to establish a time-line of the evening the victim was killed and asked appellant if he had ridden in the victim's car that night.  Appellant answered in the negative.  The detective asked appellant if he killed the victim and appellant answered that he did not.  The detective then questioned appellant

-

about his willingness to take a polygraph test, the last time he was in the victim's car, his stepfather's house, whether he knew about the outstanding capias, if he knew why the victim was killed, if he had ridden in the victim's Camaro, and whether he owed the victim money. None of appellant's responses to the questions were inculpatory. Then, the detective explained the operation of a polygraph test and told appellant the test would be inconclusive if he used alcohol or drugs. Appellant then asked Detective Baker about the capias and whether he would have to go to jail. She explained that he would go before the magistrate. She also asked him if he avoided the police because of the capias and he answered affirmatively. She asked appellant how the capias had arisen. Appellant answered that he had driven on a suspended license. She asked if he was DUI at the time he was driving on the suspended license and whether he had an identification card. His answers to those questions were not inculpatory. Appellant then was asked if he wore glasses and when he last had a haircut. His answers to those questions were not inculpatory. Then, Detective Smith asked appellant if he could examine his sweatshirt. Appellant gave the detective his shirt. Appellant does not allege and the record does not indicate that anything related to the sweatshirt provided the police with inculpatory information. The detective then explained that everyone was a potential suspect and the police were not focusing on appellant. The detectives then asked appellant to show them his hands. They

-

remarked about some cuts and scratches on his hands and arms. He explained that some of the cuts were self-inflicted and that the others were the result of playful wrestling. The answers to those questions were not inculpatory. The detectives asked appellant where he sat in the victim's car and he responded he sat in the driver's seat. They asked him if he knew where the victim kept his drugs and he responded he did not know. They asked him if he went with the victim to make drug deals and he responded negatively. The detectives asked appellant if he knew how many clients the victim had. Appellant answered that he did not know. None of these responses provided inculpatory information nor did they lead to inculpatory information. Finally, the detectives explained to appellant that he would go before the magistrate on the capias and asked him to empty his pockets on the table. The contents of his pockets did not result in the discovery of inculpatory information. None of the information provided by appellant after the invocation was inculpatory. Therefore, we find the trial court's denial of the motion to suppress was harmless error.

> "'[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt;' otherwise the conviction under review must be set aside." Lilly v. Commonwealth, 258 Va. 548, 551, 523 S.E.2d 208, 209 (1999) (quoting Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L.Ed.2d 705 (1967)). "This standard requires a determination of 'whether there is a reasonable possibility that the evidence

-

complained of might have contributed to the conviction.'" Id. (quoting Chapman, 386 U.S. at 23, 87 S. Ct. at 827).

Brant v. Commonwealth, 32 Va. App. 268, 278-79, 527 S.E.2d 476, 481 (2000).

> "In making that determination, the reviewing court is to consider a host of factors, including the importance of the tainted evidence in the prosecution's case, whether that evidence was cumulative, the presence or absence of evidence corroborating or contradicting the tainted evidence on material points, and the overall strength of the prosecution's case."

Id. at 279, 527 S.E.2d at 481 (quoting Lilly, 258 Va. at 551, 523 S.E.2d at 209).

In this case, the information provided to the detectives after appellant's invocation was harmless beyond a reasonable doubt. Based on our review of the record, the information obtained after the invocation was not important in the prosecution's case against appellant because it was not inculpatory and did not lead to inculpatory information.

Appellant argues his waiver of his Miranda rights on January 16, 1998 was not valid pursuant to the rule established in Edwards v. Arizona, 451 U.S. 477 (1981). We disagree.

> In order to "prevent police from badgering a defendant into waiving his previously asserted Miranda rights" and to "protect the suspect's 'desire to deal with the police only through counsel,'" the United States Supreme Court established the "Edwards rule" as a "second layer of prophylaxis for the Miranda right to counsel." See Davis, 512 U.S. at 458, 114 S. Ct. at 2355; McNeil

-

v. Wisconsin, 501 U.S. 171, 176, 178, 111 S. Ct. 2204, 2208, 2209, 115 L.Ed.2d 158 (1991); Michigan v. Harvey, 494 U.S. 344, 350, 110 S. Ct. 1176, 1180, 108 L.Ed.2d 293 (1990). Pursuant to Edwards and its progeny, once the defendant invokes his Miranda right to counsel, all police-initiated interrogation regarding any criminal investigation must cease unless the defendant's counsel is present at the time of questioning. See Minnick v. Mississippi, 498 U.S. 146, 153, 111 S. Ct. 486, 491, 112 L.Ed.2d 489 (1990); Arizona v. Roberson, 486 U.S. 675, 683, 108 S. Ct. 2093, 2099, 100 L.Ed.2d 704 (1988); Edwards, 451 U.S. at 484-85, 101 S. Ct. at 1885; see also Jackson v. Commonwealth, 14 Va. App. 414, 416, 417 S.E.2d 5, 6-7 (1992). If the police initiate interrogation of a defendant after he has invoked his Miranda right to counsel and before his counsel is present, "a valid waiver of this right cannot be established . . . even if he has been advised of his rights." Edwards, 451 U.S. at 484, 101 S. Ct. at 1884-85; see Eaton v. Commonwealth, 240 Va. 236, 252, 397 S.E.2d 385, 395 (1990); Hines v. Commonwealth, 19 Va. App. 218, 221, 450 S.E.2d 403, 404 (1994). However, the Edwards rule only applies to periods of continuous custody, and, if the defendant is released from custody following the invocation of his Miranda right to counsel, the Edwards rule does not bar subsequent police-initiated interrogation. See Tipton v. Commonwealth, 18 Va. App. 832, 834, 447 S.E.2d 539, 540 (1994).

Quinn v. Commonwealth, 25 Va. App. 702, 710-11, 492 S.E.2d 470, 474-75 (1997) (emphasis added).

In Tipton, we held, "[t]he Edwards rule has not been expanded to include non-custodial demands for an attorney or to interrogation after an accused has been released from custody." Tipton, 18 Va. App. at 834, 447 S.E.2d at 540.

-

In this case, appellant was not in continuous custody.  He was released from custody after the January 4, 1998 interview and was not re-interviewed until January 16, 1998.  Therefore, under Tipton, Edwards does not apply.

Appellant argues Tipton does not apply because there was a violation of his Miranda rights during the initial interview.  This argument has no merit under the facts of this case because, as we stated above, he did not provide the police with inculpatory information after the point at which he argues he invoked his right to counsel.

V.

Appellant contends the waiver of his Miranda rights on January 16, 1998 was not valid.  First, appellant argues the waiver was tainted by the Edwards violation.  For the reasons discussed above, we find this argument without merit.

Second, appellant contends the waiver was the product of police coercion, which rendered the waiver involuntary.  Appellant argues he was physically intimidated by a "belligerent and threatening officer" when he was arrested on January 16.  Specifically, he contends a detective threatened to "hammer on" him and the police made promises of leniency.  We do not address this issue because the record before us does not contain evidence of that dialogue.

Rule 5A:25 requires the appellant to file, no later than the time for filing his or her opening brief, an appendix.  Rule

-

5A:25(a).  The appendix must contain "any testimony and other incidents of the case germane to the questions presented."  Rule 5A:25(c)(3).  In this case, the record is devoid of a transcript of the January 16, 1998 interview, and the tape of the interview begins after appellant admitted he committed the murder and does not reflect the threats or promises of which appellant complains.

VI.

Appellant next contends the trial court erred in denying his motion for a mistrial based on the Commonwealth's failure to provide him with the entire videotape of the statement he made on January 16, 1998, which, he argues, was a violation of Rule 3A:11.  Appellant also argues the trial court erred in denying his motion to strike the admission of the January 16 statement as a sanction.  We disagree.

"The relief to be granted upon a violation of Rule 3A:11 is within the discretion of the trial court, giving due regard to the right of the accused to call for evidence in his favor and to investigate and evaluate the evidence in preparation for trial."  Frye v. Commonwealth, 231 Va. 370, 383, 345 S.E.2d 267, 277 (1986) (citations omitted).  "The remedial relief to be granted by the trial court following a discovery violation or upon the late disclosure of evidence is within the trial court's discretion and will not be disturbed on appeal unless plainly wrong."  Moreno v. Commonwealth, 10 Va. App. 408, 420, 392 S.E.2d 836, 844 (1990) (citations omitted).

-

The trial court struck the portion of the tape that had not been provided to appellant before trial and gave appellant the opportunity to call Tori DeMaio, the witness he contends may have been present at the murder scene and may have had actual knowledge of the sequence of events, to testify.  Appellant chose not to do so.  Further, appellant did not request sanctions for the Commonwealth prior to listening to the tape and did not request a continuance so the tape could be further reviewed.  Therefore, we find the trial court did not abuse its discretion in denying the motion for a mistrial and the motion to strike.

For these reasons, we reverse appellant's convictions for burglary, grand larceny, and vandalism and affirm his convictions for capital murder, robbery, and use of a firearm.

<u>Affirmed, in part,</u>
<u>and reversed, in part.</u>

-

Benton, J., concurring and dissenting.

I concur in Parts I, II, III, and VI of the majority opinion. Because I believe that the police violated Jason Wayne Gregory's right against self-incrimination as enunciated in Miranda v. Arizona, 384 U.S. 436 (1966), and Arizona v. Edwards, 451 U.S. 477 (1981), I dissent from Parts IV and V.

In denying Gregory's motion to suppress, the trial judge found both that Gregory was not in custody and made no unequivocal request for counsel on January 4, 1998. I believe the evidence establishes that these findings are plainly wrong. In determining whether a suspect is in custody for purposes of Miranda, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984). See also Stansbury v. California, 511 U.S. 318, 322-23 (1994) (holding that the objective circumstances must be examined to determine whether the suspect was deprived of his freedom in a significant way).

The evidence proved that a capias had been issued for the arrest of Gregory. When Gregory telephoned the police on January 4, he knew that he was wanted by two jurisdictions for various alleged wrongs and that the capias existed. Gregory testified that he "had to go with [the police detective] . . . . I was in custody. I knew that."

-

The officers who went to Gregory's home in marked police vehicles and escorted him to the police station were also aware of the capias for Gregory's arrest. The officers also knew from the beginning of the encounter that they would arrest Gregory for his previous violations. Thus, it does not matter that the officers did not communicate this fact to Gregory. See id. at 323-24. They and Gregory knew the arrest would occur. During the interview at the police station, the officers informed Gregory of the capias and delivered him to the magistrate at the end of their interview. He was the only suspect that the police questioned at the station. All of these factors indicate that Gregory was clearly in custody and any reasonable person with Gregory's record and in his situation would have understood he was in custody.

No evidence proved that Gregory was acting without compulsion when the detectives escorted him to police headquarters from his home. He was in custody, and the interview that occurred on January 4 was a custodial interrogation. During this interrogation, the officers questioned Gregory concerning the death of James Michael Lambrecht. Gregory told the officers during that interrogation "I think I should talk to a lawyer." Although the detective to whom he was speaking testified that Gregory had uttered a question, "Think it's time for an attorney?," the videotape supports Gregory's testimony. The tone and inflection of the

-

detective's response, as well as his words, indicate that he understood Gregory had made a declarative statement. The trial judge was plainly wrong to disregard this evidence and Gregory's testimony.

The record is undisputed that the officers ignored Gregory's invocation of his right to speak to a lawyer and continued questioning him. Gregory's statement resembles the statement in McDaniel v. Commonwealth, 30 Va. App. 602, 518 S.E.2d 851 (1999) (en banc). There, we held that the statement, "I think I would rather have an attorney here to speak for me," was an unequivocal request for counsel. 30 Va. App. at 606, 518 S.E.2d at 853. Therefore, I would hold that the officers in this case should have honored Gregory's request for counsel and that they violated his Fifth Amendment rights when they did not.

In unambiguous language, the Supreme Court has ruled as follows:

> If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.

-

Miranda, 384 U.S. at 473-74 (1966). "[T]he admissibility of statements obtained after the person in custody has decided to [exercise Miranda rights] depends . . . on whether his 'right to cut off questioning' was 'scrupulously honored.'" Michigan v. Mosley, 423 U.S. 96, 104 (1975).

Further explaining Miranda, the Court held in Edwards, "that an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484-85.

> The rule of the Edwards case came as a corollary to Miranda's admonition that "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present."  In such an instance, [the Supreme Court] had concluded in Miranda, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."  In Edwards, [the Supreme Court] "reconfirm[ed] these views and, to lend them substance, emphasize[d] that it is inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel."  [The Court] concluded that reinterrogation may only occur if "the accused himself initiates further communication, exchanges, or conversations with the police.  Thus, the prophylactic

-

> protections that the Miranda warnings
> provide to counteract the "inherently
> compelling pressures" of custodial
> interrogation and to "permit a full
> opportunity to exercise the privilege
> against self-incrimination," are implemented
> by the application of the Edwards corollary
> that if a suspect believes that he is not
> capable of undergoing such questioning
> without advice of counsel, then it is
> presumed that any subsequent waiver that has
> come at the authorities' behest, and not at
> the suspect's own instigation, is itself the
> product of the "inherently compelling
> pressures" and not the purely voluntary
> choice of the suspect. . . .  "[T]he accused
> having expressed his own view that he is not
> competent to deal with the authorities
> without legal advice, a later decision at
> the authorities' insistence to make a
> statement without counsel's presence may
> properly be viewed with skepticism."

Arizona v. Roberson, 486 U.S. 675, 680-81 (1988) (citations

omitted).  These principles control our review of this case.

Gregory expressed "his desire to deal with the police only

through counsel," Edwards, 451 U.S. at 485, by stating, "I think

I should talk to a lawyer."  The officers violated Miranda by

continuing the interrogation on January 4 and violated Edwards

by re-initiating questioning of Gregory on the same murder

investigation when they spoke to him on January 16.  Because of

his previous assertion of his right to counsel, the officers

were not permitted to re-initiate a custodial interrogation of

Gregory on this same matter.

The fact that Gregory did not make any inculpatory

statements on January 4 does not mean that the officers did not

-

violate his Miranda rights as enhanced in Edwards.  If Gregory had, in fact, confessed to the crime or made other inculpatory statements on January 4, clearly those statements would have been inadmissible because the officers did not read Gregory his rights and they ignored him when he asserted them.  By ignoring Gregory's request for counsel, the police sent the unmistakable message that he had no such right.  Cf. United States v. Skinner, 667 F.2d 1306, 1309 (9th Cir. 1982) (noting that the accused "knew from his experience the previous day that he could end the interrogation by asking again to meet with an attorney").  Clearly, when the police re-interrogated Gregory on January 16 concerning Lambrecht's death, Gregory could have no greater expectation that the police would honor a request for counsel.  This is especially true when the officers are questioning him again about the same events they questioned him after ignoring his earlier request for counsel.  The net effect of the officers' behavior on that date was to demonstrate to Gregory that his right against self-incrimination was illusory and that they would ignore any request he made for an attorney. This behavior defies the rationale of Edwards.  On this record, the government has not met its "heavy burden" of demonstrating that Gregory knowingly and intelligently waived his privilege against self-incrimination and his right to counsel.  See Miranda, 384 U.S. at 475.

-

The decision in Tipton v. Commonwealth, 18 Va. App. 832, 447 S.E.2d 539 (1994), does not control the outcome of this case. The police conducted two interviews with Tipton. During the initial interview, which Tipton conceded to be non-custodial, see id. at 834, 447 S.E.2d at 540, and before beginning the interrogation, the police gave Miranda warnings to Tipton. Id. at 833, 447 S.E.2d at 540. After the police gave those warnings, Tipton requested counsel. The police honored his request and did not conduct an interrogation. Id. Thus, Tipton suffered no Miranda violation because he exercised his right to counsel at his first encounter and the police honored it.

In each of the cases relied upon in Tipton, the police ceased the initial interrogation upon the accused's request for counsel. I further distinguish this case from one on which the Tipton Court relied, McFadden v. Garraghty, 820 F.2d 654 (4th Cir. 1987). In that case, as in this one, law enforcement officials blatantly ignored a suspect's assertion of his Miranda rights by re-initiating interrogation in violation of Edwards. Id. at 658. Unlike in this case, however, the confession ultimately used at trial in McFadden was obtained by a separate law enforcement agency inquiring about a crime separate from the one discussed in the initial interrogation. Id. at 660. Therefore, the break in custody in this case does not have the same effect as the break in McFadden and the Tipton rationale

-

does not apply.  Significantly, Tipton knew he could terminate a police interrogation by invoking his right to counsel.  Because of the interrogating officer's violation of <u>Miranda</u>, Gregory did not.

> [T]he "relatively rigid requirement that interrogation must cease upon the accused's request for an attorney . . . has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible.  This gain in specificity, which benefits the accused and the State alike, has been thought to outweigh the burdens that the decision in <u>Miranda</u> imposes on law enforcement agencies and the courts by requiring the suppression of trustworthy and highly probative evidence even though the confession might be voluntary under traditional Fifth Amendment analysis."  The <u>Edwards</u> rule thus serves the purpose of providing "clear and unequivocal" guidelines to the law enforcement profession.  Surely there is nothing ambiguous about the requirement that after a person in custody has expressed his desire to deal with the police only through counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."

<u>Roberson</u>, 486 U.S. at 681-82 (footnote and citation omitted).

Moreover, I believe that when the police interrogated Gregory without "restrict[ing] the second interrogation to a crime that had not been a subject of the earlier interrogation," they also

-

failed to "scrupulously honor" his Fifth Amendment rights. Mosley, 423 U.S. at 106.

For these reasons, I would hold that the officers violated Edwards when they re-interrogated Gregory on January 16 after he had asserted his Miranda rights. Because they obtained Gregory's statements in violation of the United States Constitution, the trial judge erred in refusing to suppress those statements. Therefore, I would reverse the convictions and remand this case for a new trial on the capital murder charge. For the reasons stated in the majority opinion, I would reverse and dismiss the burglary, grand larceny and vandalism convictions.